604 A.2d 1010

Andrew CARTER, a minor, by his parent and natural guardian, Donald CARTER and Donald Carter, in his Own Right, Appellants,

v.

UNITED STATES STEEL CORPORATION, Appellee.

Supreme Court of Pennsylvania.

Argued Sept. 26, 1991.

Decided March 6, 1992.

Reargument Denied April 9, 1992.

410

Edward J. Balzarini, Balzarini, Carey & Watson, Pittsburgh, Pa., for appellants.

C. Richter Taylor, Jr., Mansmann, Cindrich & Titus, Deborah A. Hammitt, Stanley Yorsz, Buchanan Ingersoll, P.C., Pittsburgh, Pa., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

OPINION ANNOUNCING THE JUDGMENT
OF THE COURT

LARSEN, Justice.

On June 1, 1984, fourteen-year-old Andrew Carter (appellant) and a friend climbed an electrical transmission tower at USX's Carrie Furnace Works in the borough of Swissvale, Allegheny County. While climbing the tower, Carter grabbed onto an uninsulated high voltage wire, and received a charge of electricity. His injuries resulted in amputation of his left forearm and one of his toes. An action was brought against USX pursuant to Section 339 of the Restatement (Second) of Torts, "Artificial Conditions Highly Dangerous to Trespassing Children." The jury returned a verdict in favor of appellants in the amount of $1,500,000, later molded to $1,200,000 to reflect the jury's apportionment of twenty percent of the negligence to Carter. The trial court subsequently granted USX a new trial after concluding that a television broadcast, viewed by certain jurors and discussed by the jury during deliberations, was prejudicial. On appeal, a Superior Court panel reversed the grant of a new trial. The case was subsequently reargued before Superior Court sitting en banc. A divided court affirmed the order granting a new trial. 390

Pa.Super. 265, 568 A.2d 646. The issue before us, upon a grant of allocatur, is whether the broadcast was a proper basis for impeaching the jury's verdict.

The jury began its deliberations on the afternoon of February 12, 1986. Not having reached a verdict that day, the jury was dismissed for the evening. During its 6:00 p.m. news program on February 12th, WTAE, a local television station, broadcast the following story (hereinafter, "the broadcast"):

> The parents of an electrocuted sixteen-year-old are suing USX Corporation. Orlando Dudley died October 4th [1986] when he touched a live wire in the Carrie Furnace Mill. The North Braddock boy was searching for copper wire. His parents claim USX was negligent because it did not warn of electrical dangers. They say the company should have posted danger signs after another boy lost a hand and part of his foot in a similar 1984 electrocution there. A lawsuit on that incident is being heard now in Allegheny County Court.

(Trial Court Opinion at 8).

This broadcast substantially summarized the contents of an article which had appeared on the morning of February 12, 1987 in the eastern suburban edition of The Pittsburgh Post Gazette newspaper. The article was entitled, "Parents sue USX over boy's mill death." (hereinafter, "the article"). The final sentence of the article quoted the manager of public affairs for USX as stating that (other than the accidents involving the appellant herein and Orlando Dudley) "no other cases involving similar accidents at the Carrie Furnace mill have been filed." [1] (The full article is attached as an Appendix hereto).

---

1. The reporter who wrote the article testified during a deposition held in the latter part of 1987 as follows:

A. I telephoned Mr. Shortridge (manager of public affairs for USX) on February 11 the day before this article was published and spoke with him regarding the article and its content, and that was the essence of our conversation.

Q. Did you in that conversation mention both the Dudley and the Carter accidents?

On the morning of February 13, 1987 counsel for USX informed the trial court of the article and the broadcast. After the jury had resumed deliberations, the trial judge met with counsel in chambers. Counsel for USX asserted that the article was so prejudicial that the jury should be polled immediately in order to determine whether they had read the article or were aware of it. After discussing the matter with counsel, the trial judge decided not to interrupt the jury's deliberations but to "let the matter roll." (N.T. 2/13/87, at 11). Before leaving chambers, counsel for USX stated, "I think that for the purposes of protection of my client, I should put on the record informally here in chambers a motion for a mistrial because I think this article is so prejudicial that ... I would be remiss if I did not do so." (*Id.*, at 12). Contrary to the trial court opinion, the record reveals that the trial court neither granted nor denied the oral motion for a mistrial at the time.[2] The final exchange between the trial judge and counsel for USX was as follows:

THE COURT: Maybe no one read it [the article] at all. Maybe you will get a defense verdict, then it becomes moot.

[COUNSEL FOR USX]: In that event, I will withdraw my motion.

(N.T. 2/13/87 at 15).

Shortly after the in-chambers conference ended, the jury returned its verdict on special interrogatories.

Before he dismissed the jury, the trial judge called each juror, individually, into his chambers and inquired about the article and the broadcast. The inquiries revealed that none of the jurors had read the article but that two of the jurors

A. Yes.

2. During the in-chambers conference of February 13, 1987, counsel for USX stated, "We ought to prepare a motion with these articles, various articles attached just for the purposes of the record, file it with the court." The trial judge responded, "You can file supplemental ones as you find out." (N.T. 2/13/87 at 14). Ten days after the verdict, USX filed such a motion. There is no indication in the record that the motion was ever granted or denied.

had seen the broadcast and that it had been discussed during deliberations. There was also testimony regarding the effect of the broadcast, a matter which is discussed infra.

■ The subject of post-verdict testimony by jurors has been extensively discussed in other opinions of this Court and does not require prolonged discussion here. Briefly stated, the need to ensure fair trials, free from improper influences must be balanced with the need for finality and for protecting the sanctity of the jury room. The rule in Pennsylvania, as well as in a majority of jurisdictions, is that a juror is incompetent to testify as to what occurred during deliberations. *Pittsburgh National Bank v. Mutual Life Insurance Company*, 493 Pa. 96, 425 A.2d 383 (1981). This rule is often referred to as the "no impeachment" rule. However, in order to accommodate the competing policies in this area, a narrow exception has been recognized. The exception permits "post trial testimony of extraneous influences which might have affected [prejudiced] the jury during deliberations." (*Id.* at 493 Pa. 101, 425 A.2d 383). Under this exception, the juror may testify only as to the existence of the outside influence, but not as to the effect this outside influence may have had on deliberations. *Pittsburgh National Bank, citing Commonwealth v. Zlatovich*, 440 Pa. 388, 269 A.2d 469 (1970). Under no circumstances may jurors testify regarding their subjective reasoning processes.

■ In the instant case, the trial judge disregarded the rule prohibiting testimony by jurors on the effect an extraneous influence may have had on their verdict. The transcript of the post-verdict polling of the jury contains precisely the type of inquiries which the law clearly prohibits. For example, the trial court stated to one juror, "You should say anything that comes to your mind." (N.T., 2/13/87 at 31). The same juror was asked by the trial court, "So, then, that did have some effect on your deliberation and your

verdict?" *Id.* Another juror was asked by the trial court, "What persuaded you to change your mind?" (*Id.,* at 35).[3]

The purpose for excluding testimony as to the effect of the extraneous influence was stated by us in *Zlatovich, supra:*

> In the course of a jury's deliberations each juror weighs countless factors many of which he may not consciously be aware he is even considering. This is a rubric of life. Whenever a choice must be made, few men come to a decision on the basis of one factor alone, but only after weighing all the conflicting variables which inhere in the choice. Being personal to each juror, the working of the mind of any of them cannot be subjected to the test of other testimony, and therefore ... such testimony should not be received to overthrow the verdict to which all assented.[4]

*Id.,* at 440 Pa. 396, 269 A.2d 469.

It is clear, then, that testimony as to the effect of the broadcast on jury deliberations was improperly received and is of no legal consequence since the jurors were utterly incompetent to testify on such a subject. That the testimony has "no legal significance" is conceded by USX. (Brief for Appellee at 19).

■ Although testimony as to the subjective reasoning processes of the jurors is inadmissible, there remains a question as to the admissibility of testimony that the broadcast was seen by two of the jurors and communicated to other jurors during deliberations. Appellants argue that our previous cases concerning the admissibility of post-

3. Two jurors testified that they had seen the broadcast; one stated that the broadcast had no effect at all while the other stated that the broadcast did affect her deliberations. Two other jurors testified that their deliberations on the verdict were influenced by discussion of the broadcast.

4. When the instant verdict was announced in open court, there was no dissent from any juror. Just before the verdict was read, the court clerk asked, "Members of the jury, have you agreed upon your answers to the interrogatories?" The jury responded, "We have." (N.T. 2/13/87 at 15).

verdict testimony provide no basis for admitting testimony that the jury was exposed to the instant broadcast. Appellants argue that post-verdict testimony is only admissible when the misconduct of a third party causes prejudicial information to reach the jury. The misconduct of jurors, themselves, is, in appellants' view, inadmissible. Appellants cite the following cases as support for their position: *Pittsburgh National Bank,* supra; *Friedman v. Ralph Brothers, Inc.,* 314 Pa. 247, 171 A. 900 (1934); *Commonwealth v. Zlatovich,* supra; and *Commonwealth v. Sero,* 478 Pa. 440, 387 A.2d 63 (1978). These cases merit consideration in light of appellants' reliance upon them.

In *Friedman,* it was alleged that the jury foreman made an unauthorized visit to the accident scene, took measurements and told his fellow jurors about his findings. Upon inquiry by the trial judge, some of these allegations were denied by the foreman, and inconsistent statements were made by the other jurors as to their recollection of what the foreman related. This Court, invoking the no-impeachment rule, held that post-verdict testimony of what transpired in the jury room was inadmissible. We then stated, "Only in clear cases of *improper conduct by jurors,* evidenced by competent testimony, should a verdict which is fully supported by the evidence be set aside and a new trial granted." (emphasis added). *Id.,* at 314 Pa. 249, 171 A. 900. Significant to the holding in *Friedman* was our finding that the information complained of could not have prejudiced the jury because the information communicated by the foreman to the other jurors was information already in evidence. Similarly, in *Pittsburgh National Bank, supra,* a juror visited a car dealership and inspected a vehicle similar to the one involved in the case. This Court resolved the issue of admissibility of post-verdict testimony by finding *Friedman* controlling and, without further discussion, held that testimony of the alleged juror misconduct was inadmissible.

In *Zlatovich, supra,* a discharged juror was quoted in a newspaper article as saying that the jury was afraid to return a verdict of not guilty by reason of insanity for fear

that the defendant might be released after a year or so. This Court held post-verdict testimony as to the juror's statement inadmissible since such testimony clearly concerned the mental processes by which the jury arrived at the verdict. In the course of resolving the issue of admissibility of post-verdict testimony, we referred in *Zlatovich* to an earlier case involving the same issue, *Welshire v. Bruaw*, 331 Pa. 392, 200 A. 67 (1938). In *Welshire,* we affirmed the trial court's decision to admit post-verdict testimony of the coercive conduct of the tipstaff in charge of the jury during its deliberations. Our decision in *Zlatovich,* in further distinguishing the admissible testimony in *Welshire,* points out that *Welshire* involved the improper conduct of a *third party* (emphasis in the original). *Zlatovich* did not hold, however, that only improper conduct of third parties is a proper basis for admitting post-verdict testimony. In fact, testimony of allegedly prejudicial *juror misconduct* was found to be admissible in *Sero, supra.* There, post-verdict testimony consisted of a statement by one juror that another juror's husband had communicated information concerning the defendant's interest in Bible study after being charged with wife's murder. This Court held that testimony of the alleged juror misconduct was admissible but again appeared to tie the admissibility of such misconduct to the concept of third party misconduct when we stated, "information, if prejudicial, that reaches a juror through a third party is precisely the evil our exception to the no impeachment rule is intended to obviate." *Id.,* 478 Pa. at 448, 387 A.2d 63. Although testimony of the alleged juror misconduct was admissible, the conduct was not sufficient to warrant the grant of a new trial since the information did not "create the potential for prejudice that we have said can emasculate a jury's impartiality and indifference, thus mandating a new trial." *Id.*

That appellants would view these cases as standing for the principle that only improper conduct by third parties may be the subject of post-verdict testimony is not inconceivable. However, no such holding emerges from these

cases despite the emphasis given the concept of improper third party influence. Rather, what emerges is the need to analyze the facts and circumstances of each case with the goal of protecting the sanctity of the jury's verdict and at the same time preventing injustice. This principle is succinctly stated in *Sero, supra:* "We can maintain the viability of the jury as a judicial decisionmaking body only by guaranteeing that a verdict is reached by evidence and argument in open court, not by outside influences that might strip the jury of the impartiality we demand." Although *Sero* is a criminal case, we believe the commitment to fairness should be the same in criminal and civil trials. "It is fundamental that every litigant who is entitled to a jury trial is entitled to an impartial jury, free to the furthest extent practicable from extraneous influences that may subvert the factfinding process." *Haley v. Blue Ridge Transfer Co., Inc.,* 802 F.2d 1532 (4th Cir.1986).

Testimony that jurors were exposed to the instant broadcast and discussed it during deliberations is not testimony of the jury's reasoning processes; rather it is testimony of overt conduct. When such overt conduct is related to an issue in the case, as it was here, the potential for prejudice may arise.[5] In light of the foregoing principles, we do not agree with appellants that post-verdict testimony as to the existence of the broadcast was inadmissible. We find support for this position in other jurisdictions which have admitted post-verdict testimony that jurors read newspaper accounts of the trial during deliberations. See, e.g., *Willis v. Louisiana Power & Light Co.,* 524 So.2d 42 (La.App. 1988); *Siegal v. Mt. Sinai Hospital of Cleveland,* 62 Ohio App.2d 12, 403 N.E.2d 202 (1978); *City & County of San Francisco v. Bricklayers Union Local & U.A. Local 38,* 217 Cal.Rptr. 167, 185 Cal.App.3d 229 (1985), *rev'd on other grounds,* 726 P.2d 538 (1986). Similarly, testimony that

**5.** We recognize that not every instance of publicity bearing on the subject of the trial has the potential to prejudice the verdict. There may be instances in which the nexus between the publicity in question and an issue in the trial is so attenuated as to render the publicity innocuous.

jurors viewed a television broadcast which discussed the subject matter of the trial in which they were engaged has also been held admissible. *Elsworth v. Beech Aircraft Corp.,* 37 Cal.3d 540, 208 Cal.Rptr. 874, 691 P.2d 630 (1984), *cert. denied,* 471 U.S. 1110, 105 S.Ct. 2345, 85 L.Ed.2d 861 (1985).

■ Once the existence of a potentially prejudicial extraneous influence has been established by competent testimony, the trial judge must assess the prejudicial effect of such influence. Because a trial judge is precluded from considering evidence concerning the subjective impact of an extraneous influence on any juror, it has been widely recognized that the test for determining the prejudicial effect of an extraneous influence is an objective one. In order to determine whether an extraneous influence is prejudicial, a trial judge must determine how an objective, typical juror would be affected by such an influence. See *After Hour Welding Inc., v. Laneil Management Co.,* 108 Wis.2d 734, 324 N.W.2d 686 (1982); *Urseth v. City of Dayton* 680 F.Supp. 1084 (S.D.Ohio 1987); *Owen v. Duckworth,* 727 F.2d 643 (7th Cir.1984); see also 3 Weinstein & Berger, Weinstein's Evidence § 606(b) (1985 & May cum. supp.). In addition, cases from other jurisdictions which have considered the prejudicial effect of an extraneous influence, make clear that prejudice is to be determined in light of the facts and circumstances in each case. "Where . . . the precise extraneous matter is known but direct evidence as to its effect on the deliberations is not permitted, a sound balance is struck by a rule which looks to the probability of prejudice from the face of the extraneous matter in relation to the circumstances of the particular case." *Fitzpatrick v. Allen,* 410 Mass. 791, 575 N.E.2d 750, 754 n. 1 (1991); see also *Harford Sands Inc., v. Groft,* 320 Md. 136, 577 A.2d 7 (1990).

Before turning to the facts and circumstances of the instant case to determine whether the broadcast in question was prejudicial, it is necessary to establish the proper standard of prejudice to be applied. Although the extraneous influence in the case at hand consists of publicity, we

deem it appropriate to apply the same standard to all cases in which the existence of an extraneous influence has been shown by competent evidence.

We begin our consideration of the proper standard of prejudice by examining the analogous situation involving an ex parte communication between a judge and jury, a situation which, like an extraneous influence, implicates the impartiality and integrity of the jury. In *Commonwealth v. Bradley*, 501 Pa. 25, 459 A.2d 733 (1983), this Court adopted a rule to be applied in both civil and criminal cases where a party seeks to have the verdict set aside on the basis of an ex parte communication between a judge and jury. A new trial will be granted in such cases only where there is a reasonable likelihood of prejudice. *Id.*, at 501 Pa. 36, 459 A.2d 733. Given the similar concerns inherent in ex parte communications and extraneous influences, such a standard is appropriate whenever the existence of an extraneous influence has been established by competent evidence, and we now adopt this standard for all such cases, with the understanding that the burden of proof is upon the moving party.[6] In determining the reasonable likelihood of prejudice, the trial judge should consider 1) whether the extraneous influence relates to a central issue in the case or merely involves a collateral issue; 2) whether the extrane-

6. The standard of prejudice to be applied where the existence of an extraneous influence has been established varies throughout other jurisdictions. See *Kirby v. Rosell*, 133 Ariz. 42, 648 P.2d 1048 (1982) (reasonable possibility of prejudice); *Ravin v. Gambrell*, 788 P.2d 817 (Colo.App.1990) (reasonable possibility of prejudice); *Meirick v. Weinmeisterer*, 461 N.W.2d 348 (Iowa Ct.App.1990) (reasonable probability); *Borden v. St. Louis Southwestern Ry. Co.*, 287 Ark. 316, 698 S.W.2d 795 (1985) (reasonable possibility); *Maryland Deposit Ins. Fund Corp. v. Billman*, 321 Md. 3, 580 A.2d 1044 (1990) (probability of prejudice). The foregoing jurisdictions place the burden for demonstrating prejudice on the moving party. Other jurisdictions, however, require the prevailing party to prove that the extraneous influence did not prejudice the verdict. See *Baptist Home of Miami Inc., v. Maler*, 579 So.2d 97 (1991) (prevailing party must demonstrate no reasonable possibility of prejudice); *Fitzpatrick v. Allen*, 410 Mass. 791, 575 N.E.2d 750 (1991) (prevailing party must show no reasonable likelihood of prejudice); *Haight v. Aldridge Elec. Co., Inc.*, 215 Ill.App.3d 353, 159 Ill.Dec. 14, 575 N.E.2d 243 (1991) (prevailing party must show no prejudice).

ous influence provided the jury with information they did not have before them at trial; and 3) whether the extraneous influence was emotional or inflammatory in nature.[7]

■ Turning to the facts of the instant case, on the morning of the in-chambers conference with the trial judge and opposing counsel, USX provided a copy of the article from the Pittsburgh Post Gazette and claimed that it was prejudicial. The claim did not specify the basis for the alleged prejudice or indicate the manner in which it was prejudicial.[8] We have previously held that prejudice in the abstract is not prejudice. *August v. Stasak*, 492 Pa. 550, 424 A.2d 1328 (1981).

Moreover, the instant broadcast can fairly be characterized as an accurate, straightforward account of the fact that a second lawsuit had been filed against USX over a similar accident at its Carrie Works; the broadcast cannot be characterized as inflammatory or emotional in nature. USX argues that the prejudicial nature of the broadcast is reflected in the fact that the trial court granted their motion in limine excluding evidence of injuries on USX property and/or USX electrical towers subsequent to the accident involving appellant. The trial court's ruling on the motion in limine is not before us on appeal and we make no determination as to the merits of that ruling; however, the trial court's decision that evidence of subsequent injuries should be excluded from trial is not determinative of whether, under the facts and circumstances of the case, there is a

7. Contrary to the view expressed in the Dissenting Opinion in this case, the three considerations listed here are not intended as a "three-part-test" or a "rule." The considerations are intended as guidance for trial courts in determining whether, under the facts and circumstances of the case, extraneous information is reasonably likely to have prejudiced the jury.

8. During the in-chambers conference of February 13, 1987, counsel for USX made only the following statements pertaining to prejudice:
[T]he article is so prejudicial to us that we have to find out whether any member of the jury was aware of it and read it.
I should put on the record informally here in chambers a motion for a mistrial because I think this article is so prejudicial that ... I would be remiss I did not do so.
(N.T. 2/13/87, at 5, 12).

reasonable likelihood that the jury was prejudiced by exposure to the instant broadcast.

Explaining its finding that the broadcast was prejudicial, the trial court stated in pertinent part:

The content of the newscast, that a teenage boy of 16 entered the same plant, climbed a similar electrical tower and was fatally electrocuted by a similar uninsulated wire while standing upon a similar platform commencing to salvage copper wire with a hacksaw, and thereafter citing the lack of safety precautions by the defendant even after a similar accident had occurred (the instant *Carter* case) raises an immediate adverse inference as to defendant's contempt for the lives of trespassing children.

(Trial Court Opinion at 13).

Information that USX had not taken precautions or made any alterations after the Carter accident was not new information to the jurors in this case. The lack of such precautions was readily apparent to the jurors when they viewed the site of the accident during trial.

In addition to the above considerations, the trial court instructed the jurors, just prior to their deliberating, as follows:

I want you to keep in mind that the dispute between these parties is for both of them a most serious matter. They rely on you and the court relies on you to give full and conscientious deliberation and consideration of the evidence and the issues ... You must not allow sympathy or prejudice to influence your deliberations. That would not be just. I stated in the beginning, give these people a fair trial, both the plaintiff and the defendant. *You should not be influenced by anything other than the evidence and the law of the case.* (emphasis added).

(*Id.*, at 712).

The trial court also instructed the jurors before they began deliberating that their duty was to "reach a fair conclusion from the evidence and applicable law." (N.T., 2/12/87).

In light of the foregoing, we find that there was no reasonable likelihood of prejudice arising from the instant broadcast.

■ The following factors are also relevant in determining whether USX should have been awarded a new trial. On February 11, 1987, while the case was still being tried, USX consented to a telephone interview with a reporter who was writing the article which appeared in the Pittsburgh Post Gazette on February 12, 1987. We do not doubt that counsel for USX were "surprised and chagrined" (Brief for Appellee, at 8) by the appearance of the article, but we cannot impute that same surprise to their client. Having participated in the process of generating the publicity about the second accident at the Carrie Works, USX is now estopped from legitimately complaining that they have been prejudiced by the jury's awareness of that publicity.

■ In addition, when the February 12th article and the broadcast were brought to the attention of the trial judge, USX chose to request immediate polling of the jury to determine whether any jury members were aware of the publicity. When the trial judge refused to conduct an immediate polling of the jury, deciding instead to "let the matter roll," counsel for USX, seemingly acquiescing, made no objection nor did he request any alternative such as having the trial judge issue cautionary instructions to the jury. A party may not remain silent and take his chances on a verdict then complain if it is adverse. *Zeman v. Canonsburg Borough*, 423 Pa. 450, 223 A.2d 728 (1966). Finally, when the trial judge advised counsel for USX that the publicity issue could become moot if USX got a favorable verdict, the response by counsel for USX constituted assent to the trial judge's decision to take a wait and see attitude toward the verdict. Again, USX is estopped from legitimately complaining.

The order of Superior Court affirming the denial of the motion for a judgment non obstante veredicto is affirmed.

The Superior Court order affirming the grant of a new trial is reversed.

ZAPPALA, J., and CAPPY, J., concur in the result.

FLAHERTY, J., files a dissenting opinion in which NIX, C.J., and McDERMOTT, J., join.

### APPENDIX

### PITTSBURGH POST GAZETTE ARTICLE

### OF FEBRUARY 12, 1987

"Parents sue USX over boy's mill death"

The parents of a 16–year–old North Braddock boy who died after being electrocuted at a steel mill are suing USX Corp. in a case similar to one being heard this week in Allegheny County Common Pleas Court.

Dorothy and Alfonso Dudley Of 825 Jones Ave., North Braddock, claim in the suit that USX was negligent because it failed to warn Orlando Dudley of electrical dangers at its Carrie Furnace mill, which straddles the communities of Swissvale and Rankin.

The boy was electrocuted last year. The lawsuit was filed last month.

In the case being heard this week, Donald and Andrew Carter, 1227 LaClair Ave., Swissvale, are claiming negligence by USX led to the electrocution of Andrew Carter at the same mill in 1984 when he was 15.

According to the Dudley complaint, Orlando Dudley and Henry Ramsey Jr. of Swissvale entered the mill on October 4 in search of copper wire.

After climbing 145 feet to a catwalk near the top of the tower, Dudley touched a hacksaw to the wire, screamed and eventually fell back onto the catwalk, Ramsey said.

Neil R. Rosen, attorney for the Dudleys, said USX was negligent in not posting danger signs at the plant. In the complaint, the Dudleys charge that USX knew the wires

were dangerous because of the Carter electrocution at the mill in 1984.

The Carter case is being heard by a jury in the courtroom of Allegheny County Court of Common Pleas Judge Richard Zeleznik.

Their suit says that on the evening of June 1, 1984, Andrew Carter entered the plant with his friend Christian Stonebreaker.

The two boys climbed the top of a tower. Carter lost his footing, grabbed an electrical wire and was electrocuted. His left hand was later amputated as was part of his left foot.

The Carters allege that USX failed to restrict access to the mill and also was negligent by failing to warn the public of electrical hazards existing there.

The Dudleys hope to recoup costs of their son's burial and wages he would have earned as an adult.

John Shortbridge, manager of public affairs for USX, said that no other cases involving similar incidents at the Carrie Furnace mill have been filed.

FLAHERTY, Justice, dissenting.

I dissent. Not only has the majority stated an unnecessarily restrictive rule to determine when extraneous communication to a jury requires a new trial, but even applying the majority's rule to the facts of this case, a new trial is required.

The three part test set out by the majority to determine whether or not there was prejudice in the extraneous influence, here the broadcast, is as follows:

1) whether the extraneous influence relates to a central issue in the case or merely involves a collateral issue; 2) whether the extraneous influence provided the jury with information they did not have before them at trial; and 3) whether the extraneous influence was emotional or inflammatory in nature.

Op. at 1017. This rule is purportedly derived from *Commonwealth v. Bradley*, 501 Pa. 25, 459 A.2d 733 (1983), where this court held that a new trial will be granted because of an ex parte communication between a judge and jury only where there is a reasonable likelihood of prejudice. I see no need to further delineate the holding of *Bradley*, as the majority does by way of its three-part rule, for prejudice will be apparent on the facts of each case. And in any event, the majority's third requirement, emotional or inflammatory material, is irrelevant to this analysis. If extraneous material going to a central issue in the case is put before a jury, and that material is not otherwise available, the material need not be inflammatory in order for it to be prejudicial. A jury's deliberations are to be based on evidence produced in court, not on information received from extraneous sources.

But even if one were to agree with the majority's three-part rule, I cannot agree with the majority's application of the facts in this case to its rule. Two members of the jury saw and discussed with other members of the jury a television broadcast concerning the lawsuit which they were hearing. The broadcast stated:

> The parents of an electrocuted sixteen-year-old are suing USX Corporation. Orlando Dudley died October 4th [1986] when he touched a live wire in the Carrie Furnace Mill. The North Braddock boy was searching for copper wire. His parents claim USX was negligent because it did not warn of electrical dangers. They say the company should have posted danger signs after another boy lost a hand and part of his foot in a similar 1984 electrocution there. A lawsuit on that incident is being heard now in Allegheny County Court.

This news broadcast which the jurors heard and discussed concerned precisely what they were not permitted to hear at trial, for the trial court had granted a motion in limine excluding evidence of injuries on USX property subsequent to the accident involving Carter.

The extraneous material heard by some of the jurors and discussed by all of them is plainly inflammatory, for it

involves an even worse injury to a child occurring on the corporation's property in similar circumstances, and it invites the invalid logic that any doubt as to the defendant's negligence is removed when, after the accident in this case, another similar accident occurred which the company did nothing to prevent. In fact, the inflammatory nature of this information is precisely why the trial court, correctly, excluded it from evidence.

I would expand the rule of *Bradley* (dealing only with exparte communications between the court and juries), and hold simply that a new trial is required if a jury has received extraneous information that is reasonably likely to prejudice a party. Beyond that, I would affirm Superior Court's grant of a new trial.

Finally, I do not believe that the attorney for USX seemingly acquiesced, as the majority puts it, to the trial court's refusal to poll the jury. The court refused counsel's request to poll the jury and stated that the request may be moot after the verdict was returned. I understand this ruling to be that the matter of polling the jury would be adjudicated, if at all, after the verdict was returned.

NIX, C.J., and McDERMOTT, J., join this dissenting opinion.