**Pratt v. St. Christopher's Hospital**

*Gayle R. Lewis,* for plaintiffs.

*Charles A. Fitzpatrick,* for defendants Souder and Fisher.

*William Sutton,* for defendant St. Christopher's Hospital.

DiNUBILE JR., *J.,* May 11, 2001—This opinion arises from the denial of plaintiffs' post-trial motions nunc pro tunc; resulting in entry of a judgment in favor of the defendants. The issue involves impeachment of the jury's verdict. The case was a medical malpractice in which parents had brought suit on behalf of their minor son for failure to timely diagnose a subdural empyema (a pernicious infection of the brain) which ultimately led to brain damage. The defendants were Ronald L. Souder M.D., the treating pediatrician, Margaret Fisher M.D., the pediatric infectious disease specialist, and St. Christopher's Hospital, where treatment occurred. The jury's deliberation was called into question by one of the jurors, who found in favor of the defendants, by virtue of a letter she sent to this court. After review of the case law, it is concluded that the contents of the letter would be insufficient to impeach the jury's verdict. Consequently, judgment has been entered on this verdict.

The facts and procedural history leading to the filing of post-trial motions, are as follows. The child, Michael Nesmith Jr., (the parents and child will hereinafter be referred to as plaintiffs) then 6 months old, was hospitalized at defendant St. Christopher's Hospital on August 10, 1989 due to a high fever and a full fontanelle (a bulging of the anterior of his forehead). A spinal tap, ordered and performed almost immediately after admission, ruled out meningitis. After treating the child for about eight days, a CAT scan was performed which revealed the subdural empyema. Plaintiffs maintain that it was negligent on the part of the defendant physicians (and the hospital as their ostensible agent) not to have diagnosed this condition sooner. As a result of this failure of diagnosis, plain-

tiffs asserted that the child suffered severe brain damage. The issues of negligence and causation were hotly contested by the defense. The defendants maintained that since the spinal tap showed clear spinal fluid, there was no reason to believe that the child suffered from this rare and vicious disease. Defense also asserted that since there was no vomiting, the fontanelle had been flat during the majority of the child's stay at the hospital and he was alert up until shortly before the CAT scan was performed, that there was no reason to believe that he suffered from this disease. The defendants' experts maintained that the subdural empyema, which emanated from an e-coli bacteria, is extremely rare. Thus, only after the child became extremely ill and lethargic, on or about the eighth day of hospitalization, it was reasonable and within the standard of care to order a CAT scan of the brain. As stated, on August 18, 1989, the test was performed and the disease was detected.

This was the second trial of the case. It had been tried before the Honorable Paul Ribner, resulting in a defense verdict. Judge Ribner had granted a new trial, after an appeal to the Superior Court affirming his decision, the case came before this court on January 29, 2001 for trial. On February 7, 2001, after the jury had deliberated about eight hours over a two-day period, a verdict was rendered in favor of the defendants. After the verdict was announced, the jury was polled indicating that 10 jurors had found in favor of the defendants and two for the plaintiffs. Then the verdict was recorded. No post-trial motions were filed within the required time period pursuant to Pa.R.C.P. 227.1(c). On February 22, 2001, this court received a letter from Pamela Toller, one of the jurors,

dated February 14, 2001, which was made part of the record. She originally had been an alternate but became a jury member when one of the original jurors was excused. She was one of the 10 jurors who found in favor of the defendants. In her letter, she stated that she believed her fellow jurors worked hard to reach what they perceived was a proper verdict. She felt, however, that some of the jurors might have been influenced by their relatives and friends who worked in the medical profession, or by their own personal physicians, as a result of discussing the case with them during the course of the trial and jury deliberations.

By letter dated February 28, 2001, the court sent copies of this letter to counsel. Plaintiffs' counsel then filed two sets of post-trial motions, nunc pro tunc, dated March 5, 2001 and March 7, 2001. By order of March 13, 2001, the court permitted the filing of these post-trial motions; limited solely to the issue involving jury deliberation. In these motions, the plaintiffs requested either a new trial, or in the alternative, a hearing on this issue. On May 1 and 4, 2001, plaintiffs' counsel reiterated their request for this relief by way of hearing by filing a motion for an emergency hearing and responding to defendants' objection to hold it. After review of the case law, in particular the cases of *Carter by Carter v. U.S. Steel Corp.,* 529 Pa. 409, 604 A.2d 1010 (1992) and *Orndoff v. Wilson,* 760 A.2d 1 (Pa. Super. 2000), this court has denied the post-trial motions; refusing to hold a hearing, and entering judgment on the verdict.

The plaintiffs' prayer for a hearing to determine whether outside influences affected the jury's deliberation is not required under Pennsylvania law and would

be meaningless if held in any event. The Commonwealth has what is termed as the "no impeachment" rule concerning whether a valid attack can be made on the verdict rendered by a jury. In determining whether a verdict can be set aside based on extraneous influence, the court must first decide whether a hearing is warranted. If a hearing is in fact held, a juror may testify only as to the existence of the outside influence, but not how an individual juror may be affected in arriving at his or her decision. The determination then rests with the trial judge as to whether to grant a new trial based upon the nature of the influence. To allow a less restrictive rule would mean that no jury verdict would ever be safe from attack. A juror who may have had a change of heart could, at a subsequent time, return to court stating how and why some outside influence had governed his or her decision. Pennsylvania law prohibits this type of situation from occurring. See *Carter, supra.* The testimony of the subjective reasoning process of the juror is inadmissible. See *Orndoff, supra.* Applying this Pennsylvania principle of law to the instant case, it is clear that the contents of Ms. Toller's letter are insufficient in nature to require a hearing and grant of new trial. It states, to her knowledge, the jurors in question spoke to "various people such as relatives and friends involved in the medical profession and their own personal physicians to get their opinions regarding whether a CAT scan should have been performed earlier;" presumably to determine when the infection should have been discovered. If a hearing were held, what else could Ms. Toller testify about that was not already contained in her letter? If other jurors were subpoenaed, all they would be competent to testify about

would be whether they did in fact discuss the case with individuals not on the jury. Ms. Toller does not know whether these discussions influenced these jurors nor can these jurors testify to this aspect as well. Consequently, on this basis alone, the Toller letter's contents are insufficient for this court to disturb the verdict.

In addition, it seems that the information which was the subject matter of the extraneous communications was well covered by both sides in the presentation of the parties' respective cases. The issue raised in the letter involved when the CAT scan should have been performed to determine the existence of the subdural empyema. There was ample testimony, presented at trial, by experts for both the plaintiffs and the defendants, as to what period in time during the child's treatment, it was reasonable to order the CAT scan. Under the case law cited, if the subject of the so-called outside influence amply had been covered at trial, then any information a juror might have acquired outside the trial itself is irrelevant and moot. While it is true and fundamental that every litigant is entitled to trial comprised of an impartial jury, free to the furthest extent practical from extraneous influences, this principle does not mean that any outside factor raised must necessarily be pursued. See *Carter, supra* at 419, 604 A.2d at 1015. A weighing and considering of the "no impeachment" rule, the nature of the alleged extraneous influence raised in this case, and its relation to what was presented at the trial, clearly leads to the conclusion that a new trial is not warranted in this instance.