## Tabchi v. Duchodni

C.P. of Lehigh County, no. 1999-C-0207.

*Dennis G. Charles,* for plaintiffs.
*Frank Procyk* and *John Ashley,* for defendants.

REIBMAN, *J.,* April 11, 2002—Before the court are plaintiffs' post-trial motions seeking a new trial on the issue of damages or, in the alternative, a judgment n.o.v. Because the jury's verdict bears no reasonable relation to the evidence presented, the verdict must be overturned and the case retried on the issue of damages.

## I. BACKGROUND

While riding in their family automobile on Sunday, February 16, 1997, George and Hiyam Tabchi, husband and wife, and their three minor children, Rehab, Resam, and Simon (collectively, plaintiffs) were involved in an accident in which their car was struck by an automobile operated by defendant Miriam Duchodni. The impact of the collision caused plaintiffs' vehicle to swerve and strike a building. As the facts with respect to the cause of the accident were not in doubt, plaintiffs were granted partial summary judgment on the issue of liability. Defendant was held solely responsible for the accident, leaving only the issue of damages to be tried before the jury.

After a four-day trial that began on September 24, and ended on October 1, 2001, the jury returned a verdict in the amount of zero dollars as to each of the five plaintiffs, even though injuries to two of them were uncontroverted.

By way of further background, on September 11, 2001, Arab terrorists hijacked four commercial jetliners in the United States and crashed two of them into the twin towers of the World Trade Center and one into the Pentagon. The fourth plane crashed in western Pennsylvania. By the time jury-selection commenced, less than two weeks later, the country was still reeling from those events. As is by now well known, these amounted to the most dramatic and deadly acts of terror ever committed in the United States. At the time of trial, it was believed more than 3,000 people, mostly American citizens, had perished. It is fair to say that the country was vigilant, indeed on edge, fearful that Arab extremists would commit other acts of terror against American citizens anywhere in the world. For the first time, Americans saw themselves as truly vulnerable to large-scale acts of terror within the United States. The country was mobilizing for a full-scale war against terrorism, with Arab extremists as the foremost enemy.

With this backdrop, the trial began; and plaintiffs are a family of Arab-Americans. Numerous references to their background were made during the trial. Plaintiffs George and Hiyam Tabchi were born in Syria and immigrated to the United States as adults. Hiyam's testimony at trial revealed a marked accent. Plaintiffs' family activities and dynamics were linked closely to their Arabic heritage and culture. Further, the trial itself was inter-

rupted when a bomb-threat necessitated the evacuation of the courthouse.[1]

Immediately after the jury rendered its verdict and was dismissed by the court, one of the jurors approached plaintiffs' counsel and allegedly informed him of disparaging remarks concerning plaintiffs' Arabic heritage and culture made by other members of the jury during the course of their deliberations. Several days later, on October 25, 2001, the court received a letter, dated October 16, 2001, from the jury foreperson. In that letter, the juror claimed that the ethnicity of the plaintiffs was openly discussed and apparently considered as a factor in the jury's deliberations.

Plaintiffs urge that a new trial be granted on two grounds.[2] First, they argue that the verdict bears no reasonable relation to the evidence presented and must, therefore, be overturned. Second, they maintain that the

---

1. There is no basis to believe that the bomb-threat was related to this case. The courthouse had been the subject of a number of similar threats throughout 2001.

2. As noted above, plaintiffs initially moved for judgment n.o.v. as well. At oral argument, however, plaintiffs' counsel conceded that a factual issue concerning the amount of damages would remain even if the jury's verdict were to be discounted. Irrespective of whether counsel's admission rises to the level of stipulation, it remains true that judgment n.o.v. can only be granted when there exists no genuine issue of material fact which, if decided in favor of the victor at trial, could support the verdict, thus entitling the losing party to judgment as a matter of law. *Moure v. Raeuchle,* 529 Pa. 394, 402, 604 A.2d 1003, 1007 (1992). It is apparent that even if it is decided that this jury's verdict cannot be reconciled with the evidence it considered, a question of fact as to the extent, if not the existence, of damages still remains. Thus, judgment n.o.v. would not be an appropriate remedy here.

evidence of racial bias and prejudice constitutes such juror misconduct that the verdict itself is fatally flawed and must be rejected. Additionally, an issue is also presented concerning the extent to which it may be inferred that prejudice or passion infected the outcome, based on the nature of the verdict itself.

## II. VERDICT AGAINST THE WEIGHT OF THE EVIDENCE

A basic principle of our system of jurisprudence is that the jury is the ultimate finder of fact, and that it is "free to believe all, some, or none of the testimony presented . . . ." *Neison v. Hines,* 539 Pa. 516, 520, 653 A.2d 634, 637 (1995). Nonetheless, the jury is not free to render a verdict that "is so disproportionate to the uncontested evidence as to defy common sense and logic." *Id.* at 521, 653 A.2d at 637. As our Supreme Court noted in *Kiser v. Schulte,* 538 Pa. 219, 225-26, 648 A.2d 1, 4 (1994), "Where the jury's verdict is contrary to the evidence as to 'shock one's sense of justice' a new trial should be awarded"; and "where the injustice of the verdict 'stand[s] forth like a beacon,' a court should not hesitate to find it inadequate and order a new trial."

In cases involving the adequacy of compensation in personal-injury matters, like that which is presented here, the Superior Court has summarized the pertinent rule: "jury verdicts awarding zero damages are against the weight of the evidence where undisputed medical evidence reveals that the plaintiff has suffered injuries in the accident that were of a type normally associated with pain and suffering." *Burnhauser v. Bumberger,* 745 A.2d

1256, 1261 (Pa. Super. 2000). Earlier cases reveal a standard by which to determine whether particular injuries are of a type normally associated with pain and suffering and which, therefore, must be compensated through an award of damages. *Neison,* 539 Pa. at 524-25, 653 A.2d at 638.

In *Boggavarapu v. Ponist,* 518 Pa. 162, 165, 542 A.2d 516, 517 (1988), the plaintiff received two puncture wounds on his arm when he was bitten by his neighbor's dog. He went to the hospital and was given two tetanus shots. *Id.* He claimed that the tetanus needle pierced his sciatic nerve, and he sued for pain and suffering and medical expenses. *Id.* The jury exculpated the hospital and treating physician, and held the dog's owner responsible for the dog bite, awarding plaintiff only $42.60, the cost of the emergency room treatment, as damages. *Id.* at 166, 542 A.2d at 518. The Supreme Court upheld the verdict. It noted the plaintiff did not complain that the dog bite itself caused his injury, observing: "All his complaints were the product of the tetanus needle which he complained pierced his sciatic nerve. Whether it did or not was vigorously contested by both sides." *Id.* at 168, 542 A.2d at 518.

The Supreme Court drew a distinction between "obvious" or "objective" injuries, on the one hand, and injuries in which pain and suffering is merely "subjective," on the other hand. It defined an "obvious" injury as one "which human experience teaches there is accompanying pain." *Id.* at 167, 542 A.2d at 518. The court explained that these are "injuries . . . in the most ordinary sense: the broken bone, the stretched muscle, twist of the skeletal system, injury to a nerve, organ or their function,

and all the consequences of any injury traceable by medical science and common experience as sources of pain and suffering." *Id.* Those injuries may not be disregarded and must be compensated. By contrast, a non-obvious injury, such as pain that "has no known medical source and is subjective to the person," could be compensable if the triers of fact "believe and accept that it could and[,] in fact[,] exists." *Id.* The jury did not believe the needle pierced plaintiff's sciatic nerve; thus, the specific cause of the alleged pain was rejected. *Id.* In other words, an injury not traceable by medical science or common experience need not be compensable if the proffered explanation of injury lacks credibility.

In reviewing *Boggavarapu,* the Supreme Court in *Neison* determined the jury's "rejection of the specific cause of the alleged pain 'reduced the issue from one of obvious injury to one of subjective pain.' " *Neison,* 539 Pa. at 524, 653 A.2d at 638. In other words, since what might otherwise be an obvious injury—puncturing a nerve with a needle—was itself a matter in dispute, the jury was free as a threshold matter to disbelieve that such an injury occurred. Consequently, the entire matter could be evaluated under the more free-ranging subjective standard. As the court put it, "Accordingly, we held that the jurors were not compelled to find pain where there was no objective injury." *Id.,* 539 Pa. at 524, 653 A.2d at 638. By necessary implication, however, the court indicated that once causation is established or is uncontroverted, jurors must find pain when an obvious injury exists. *Id.*

Indeed, this was the result that followed in *Neison* itself. A serious automobile crash resulting in a visible contusion to the head, along with accompanying neck and shoulder pain, was held to be "an obvious injury of

the type that produces pain rather than a subjective complaint." *Id.* at 524, 653 A.2d at 638. The court also cited with approval *Hawley v. Donahoo,* 416 Pa. Super. 469, 611 A.2d 311 (1992) (fractured vertebra is an obvious injury and a jury cannot freely disregard evidence of obvious injuries), and distinguished cases in which no objective evidence of injury occurred, *e.g., Holland v. Zelnick,* 329 Pa. Super. 469, 474, 478 A.2d 885, 888 (1984) (motor vehicle accident consisting of mere "bump" and medical testimony that pain was attributable to stress, not the accident, justified award of no damages).

Thus, the *Neison* gloss on the *Boggavarapu* objective-subjective distinction may be summarized as follows: When objective injuries are not "vigorously contested," a jury may not disregard pain and suffering. *Neison,* 539 Pa. at 524-25, 653 A.2d at 639. Instead, a jury may only decline to award pain and suffering which naturally follows, as a matter of law, from so-called objective injuries if the alleged cause of the pain, namely, the objective injury, is itself in dispute.[3] *Id.* This rule must now be applied to each of the plaintiffs to ascertain the existence

---

3. The Supreme Court revisited this issue yet again in *Davis v. Mullen,* 565 Pa. 386, 773 A.2d 764 (2001). Although defense counsel stressed at oral argument that *Davis* represents a subsuming of the objective-subjective distinction under the rubric of credibility of witnesses, such is not the case. The only thing that *Davis* adds to the analysis is a rejection of a per se rule that if medical expenses are awarded, a jury must also award pain and suffering. *Id.* at 396, 773 A.2d at 769. Instead, the court held that a jury may award the former and decline the latter if (1) it did not believe that the plaintiff suffered any pain and suffering and/or (2) a pre-existing condition or injury was the sole cause of the alleged pain and suffering. *Id.* at 396-97, 773 A.2d at 770. It must be noted, however, that nothing in *Davis* over-

of any uncontested, obvious, or objective, injuries for which compensation must be made.

Both sides acknowledged that Hiyam Tabchi suffered several fractured ribs as a result of the accident. (See pl. exhibit 9 at 17, and deft. exhibit 1 at 16.)[4] Also, it was uncontroverted that she received multiple superficial lacerations of the forehead, resulting in some permanent scarring. These injuries were caused by glass shards that became embedded when her head struck the windshield of her vehicle. Such injuries are obvious and objective and, by any estimation consistent with human experience, result in pain and suffering for which compensation must be made. Thus, the jury's award of zero damages as to her must be rejected as being against the clear weight of the evidence.

---

ruled the objective-subjective test outlined in *Neison* that is to be used to determine when a jury must, in fact, find pain and suffering based on the nature of the injury as opposed to the mere existence of medical expenses. That is, *Davis* merely made clear that an expense will be incurred for medical treatment no matter how light or grave the injury; thus, this cost alone cannot be dispositive of pain and suffering. Instead, one must turn to *Neison* for continuing guidance in this realm. Cf. *Majczyk v. Oesch*, 789 A.2d 717 (Pa. Super. 2001) (Applying *Davis*, without addressing objective-subjective distinction, to hold that it is within purview of jury to discount alleged soft-tissue injury stemming from five-mile-per-hour "bump" at traffic light.).

4. Plaintiffs also point out that several of the injuries were also conceded by defense counsel in closing argument. (N.T. 10/1/2001 at 4-7 and 30.) Because closing arguments are not evidentiary in nature, the jury cannot be specifically faulted for failing to accord weight to any characterizations of the evidence contained therein. Nevertheless, nothing prevents a court from taking note of such concessions in considering the overall reasonableness of the jury's verdict. See *e.g., Hawley,* 416 Pa. Super. at 473, 611 A.2d at 313 (In granting a new trial, the Superior Court noted that "counsel recognized the existence of . . . pain in his closing argument.").

Inextricably related to Hiyam Tabchi's injuries is the loss-of-consortium claim of her husband, George Tabchi.[5] A husband's claim for loss of consortium constitutes a separate and distinct cause of action, but recovery is predicated upon his spouse's physical injuries. *Darr Construction Co, v. W.C.A.B. (Walker)*, 552 Pa. 400, 408, 715 A.2d 1075, 1080 (1998). Accordingly, such a claim rises or falls depending on the extent to which the spouse is debilitated and thereby incapable of providing "services, society, and conjugal affection" to her partner. *Id.* Since the jury found no compensable injury to the wife, it necessarily followed that it found no loss of consortium. However, requiring that wife's injuries be compensated revives husband's claim for damages arising out of her injuries.

Uncontroverted medical testimony established that Rehab suffered a deviated septum, facial cuts and a bruised knee when she was thrust forward into the rear of the front seat of the vehicle. (Pl. exhibits 5, 6, 10 at 18-20, and 34(a).) She suffered intermittent nose bleeds over the next two years that were treated through cauterization and packing with gauze saturated with petroleum jelly. (Pl. exhibit 10 at 18-20.) Her injuries are at least as severe as the bruise to the head in *Neison,* which was held to be an obvious injury normally associated with pain and incapable of being dismissed by the jury. Therefore, the verdict with respect to her must also be set aside.

Resam's injuries were diagnosed as left lower-extremity contusion, facial abrasion and minor head injury. (N.T. 9/25/2001 at 121-23, 154-55; pl. exhibit 12G.) She com-

---

5. Plaintiff George Tabchi settled his personal-injury claims against defendant out of court.

plained of pain in her right lower leg and from abrasions. *(Id.)* While these injuries were uncontroverted, the pain and suffering associated with them is arguably more subjective in nature. Based on the evidence presented, none of her injuries was objective or obvious; they involved chiefly the complaint of pain. The jury, therefore, was not obligated to believe that she suffered compensable injury; rather, the nature of her injuries were such that the jury could have disregarded them, in the language of *Boggavarapu,* as a "transient rub of life."

Similarly, Simon's injuries were diagnosed as facial abrasion and minor head injury. (N.T. 9/25/2001 at 144-49, 171-73; pl. exhibit 12H.) His chief complaint consisted of pain to the right side of his face. *(Id.)* He testified that his head injury caused him to have double vision for about eight weeks and pain to his neck that restricted his range of motion. *(Id.)* As with the injuries allegedly incurred by Resam, and based on the evidence it considered, the jury was able to conclude that these injuries were not obvious or objective. Thus, the jury was not obligated to find damages under the *Neison-Boggavarapu* standard.

## III. EXTRANEOUS INFLUENCES ON THE JURY: JUROR MISCONDUCT IN THE FORM OF RACIAL BIAS AND SURROUNDING EVENTS AS EXTERNAL INFLUENCES

### *Juror Allegations of Racial Bias*

As to the argument presented by plaintiffs concerning improper extraneous influence as an alternative ground

for a new trial, the rule at common law was strict. Under no circumstances could a juror impeach his own verdict. *Vaise v. Delaval,* 99 Eng.Rep. 944 (K.B. 1785) (Lord Mansfield).[6] Iowa, however, led the way in carving out an exception to the Mansfield Rule in *Wright v. Illinois & Miss. Tel. Co.,* 20 Iowa 195 (1866), which Pennsylvania later followed. *Carter by Carter v. U.S. Steel Corp.,* 529 Pa. 409, 604 A.2d 1010 (1992) (plurality opinion); *Boring v. Lamarca,* 435 Pa. Super. 487, 646 A.2d 1199 (1994); Pa.R.E. 606(b). According to this approach, only extraneous influences may be considered in granting a new trial. *Carter,* 529 Pa. at 418, 604 A.2d at 1016. The common-law "no-impeachment rule" is retained, however, to the extent that a juror may not testify as to the reasoning process undertaken by the jury in arriving at its verdict. *Boring,* 435 Pa. Super. at 491, 646 A.2d at 1201. Thus, when evidence of an extraneous, or outside, influence on the jury is presented, a two-fold inquiry follows. *Id.* at 493, 646 A.2d at 1203. The threshold inquiry becomes: Was there an external influence on the jury? If this is answered in the affirmative, the court must ascertain whether the influence was prejudicial, and this becomes an objective test. *Id.* The court must ask: How would a typical juror be affected by such an input? *Id.* The court must not, however, inquire nor take evidence of how the deliberative process in the case itself was or was not affected by the external factor. *Id.* at 494, 646 A.2d at 1203. This prohibition applies with equal force to jurors themselves who come forward. Their testimony

---

6. The "Mansfield Rule" derived from the then-reigning principle that a man could not be heard to allege his own turpitude—nemo turpitudinem suam allegans audietur. *Id.*

may not be received when it relates to the internal deliberative undertakings that occurred in the jury room. *Id.* at 495, 646 A.2d at 1203. See also, Pa.R.E. 606(b). (Juror may testify as to outside influence, but is incompetent to testify as to deliberative processes.)

Plaintiffs' contention that the jury was influenced by anti-Arab bias and bigotry in the course of its deliberations is based solely upon the allegations of other jurors. However, such prejudice in the deliberative process, if it existed, and as odious and repugnant as it would be, is not an external or extraneous input that would override the sacrosanct nature of jury deliberations. Cf., *e.g., Carter,* 529 Pa. at 419, 604 A.2d at 1015 (evidence of jurors watching television broadcast directly relating to events at trial properly received); *Friedman v. Ralph Brothers Inc.,* 314 Pa. 247, 171 A. 900 (1934) (judge permitted to inquire into jurors allegedly visiting accident scene). In the absence of an external, extraneous influence, jurors may not testify with respect to the verdict. Therefore, the alleged statements and the letter of a juror as to the nature of the jury's deliberation may not be considered in evaluating the jury's decision.

### Surrounding Events As External Influences

Assuming that the unprecedented events of September 11 and the bomb-scare combined with the fact of plaintiffs' Arabic extraction to constitute an "extraneous" influence upon the jury, the determination of whether it resulted in prejudice against plaintiffs must be an objective one.[7] *Carter, supra.* Since no evidence may be taken

---

7. Note that it is not at all evident nor is it held here that such background events are tantamount to the bona fide external influences rec-

of matters relating to the internal deliberative process of the jury, one must ask: How would an average juror respond to these stimuli?

First, apart from taking judicial notice of the general temper of the times, there is no factual basis upon which to conclude that those events would have caused an average juror to disregard his sworn duty and the court's instructions to decide the case solely upon the law and evidence of the case. Second, to assume that an average juror would yield to racist impulses would undermine the very foundation upon which our system of jurisprudence is based. One cannot conclude an *average* juror will yield to racism while maintaining that the jury system composed of those very same average jurors is a fair system that works and is worthy of keeping.

While this reasoning might ring hollow as clever sophistry in the ears of the wronged who are in search of immediate justice, it must be borne in mind that as officers of the court and, indeed, more fundamentally as citizens, we seek much more than justice on a case-by-case basis; we are also stewards of a process. And the process of administering justice through the jury system has as its foundation an abiding assumption that citizens called to jury duty will exhibit the best they have to offer, not the worst. Thus, I am constrained to hold that an average juror would put aside the extraneous events of Septem-

---

ognized in the case law, *supra,* such as a television broadcast and visits to an accident or crime scene. But because the overarching question of improper influence can be adequately disposed of on the second, objective, prong of the *Carter* test, the specific issue of whether the background events which existed here actually constitute extraneous influences need not be reached.

ber 11 and the bomb-scare and not single out plaintiffs as an outlet of some frustrated, misguided rage merely because of their Arabic heritage and culture.

## IV. VERDICT CONTAMINATED
## BY PREJUDICE OR PASSION

The Pennsylvania Supreme Court has also instructed that a jury verdict is to be "set aside as inadequate when it appears to have been the product of passion, prejudice, partiality, or corruption." *Kiser,* 538 Pa. at 225, 648 A.2d at 4. Thus, a more nettlesome issue arises from the question as to whether prejudice may be inferred under the *Kiser* standard from the various circumstances surrounding this case. That is to say or, rather, to ask: May the court infer that "prejudice" infected the entire verdict by taking judicial notice of the events of September 11 and the bomb-scare and, considering this in combination with the conclusion that a verdict was rendered against the weight of the evidence as to Hiyam and Rehab, deduce that prejudice impermissibly colored the verdict? Alternatively, it may be inquired whether there exists evidence of a "passion" based solely on the actions exhibited by this jury in rendering its verdict. If it does, a pall of doubt has been cast on the verdict and a new trial must be granted.

The central problem with the first of these arguments parallels the problems encountered in treating the September 11 attack and the bomb-threat as extraneous events: namely, the matter of competent evidence. Putting aside, as a court must, the allegations of what went on inside the deliberation room, no evidence remains of

racial prejudice on the part of this jury. Moreover, although in popular parlance the phrase "prejudice" has become synonymous with, if not identical to, the notion of racial prejudice and bigotry, it is fair to say that a different meaning is ascribed to the word in the context of the law, more generally, and in the conduct of trials, more specifically. As the term has been used in the case law concerning the granting of new trials, "prejudice" is used in the more literal sense of something that would predispose a fact-finder to decide one way or another, irrespective of the evidence.

Accordingly, in cases that have found cause for a new trial on grounds of prejudice, the courts have been able to point to some objectively verifiable external circumstance impinging upon a specific juror that would have the logical result of causing a typical juror to be biased in his determination of the relevant facts. See *e.g., Commonwealth v. Cornitcher,* 447 Pa. 539, 291 A.2d 521 (1972) (juror was robbed in same vicinity and manner as murder at issue in trial in which she sat as fact-finder) and *Fletcher v. Cavell,* 287 F.2d 792 (3d Cir. 1961) (juror was later ascertained to be son-in-law of prosecution witness).[8] This is something quite apart from proffered evidence that individual jurors held mental biases or indulged in racial prejudices. The latter, be it ever so disturbing, relates to internal mental processes. As such, they

---

8. It will be noted that these are criminal cases. Pennsylvania, however, incorporates the same due process concerns regarding impartiality of jurors into civil as well as criminal proceedings. See *e.g., McHugh v. Procter & Gamble Paper Products,* 776 A.2d. 266 (Pa. Super. 2001) (granting new trial in civil matter on grounds of juror prejudice and citing criminal cases in support thereof).

are off-limits when it comes to scrutiny of verdicts and, consequently, there is no possible way to receive evidence of juror prejudice in this manner.

Therefore, while a court can take cognizance of a verdict which it has determined to be inadequate as matter of law, without competent evidence linking this outcome to "prejudice," a new trial may not be granted on that ground. That is, inadequacy of a verdict does not lead one ineluctably to the conclusion that racial prejudice infected the verdict. There is a syllogistic leap in such a determination which is not allowed.

The same outcome, however, does not follow with respect to "passion," when that word is understood in its normal meaning as the antithesis of reason and prudence.[9] Here, it is clear that, at least with respect to Hiyam, who suffered broken bones, and Rehab, who sustained a deviated septum, the jury wantonly disregarded the law in awarding zero damages. Admittedly, it may well be tautological to find that the jury's error in failing to award damages to Hiyam and Rehab serves as additional evidence of caprice toward these same plaintiffs. Separate grounds for a new trial in such a circumstance would really not be separate at all; the same actions, if found under one theory, support the outcome in the other. Con-

---

9. To elaborate a bit further, one readily thinks of the jury or the fact-finder as a *dis*passionate investigator of truth. Passion, connotes the very opposite: one given to emotion, caprice, or illogic. And this provides grounds for a new trial independent of a verdict found to be against the weight of the evidence. See *e.g., First National Bank of Altoona v. Turchetta,* 407 Pa. 511, 181 A.2d 285, 288 (1962) (A "perverse or capricious verdict *or* one plainly against the weight of the evidence ought not to be allowed to stand." (emphasis added)).

versely, if they are discounted in one, they must also be discounted in the other.

The same circularity does not arise, however, if the court concludes, as it must, that the wanton disregard of the law in the jury's consideration of Hiyam's and Rehab's injuries evidenced an absence of reason and spirit of caprice so pervasive that it tainted the outcome with respect to all of the plaintiffs. That is the unavoidable conclusion in the present case. This jury was clearly instructed that "defendant was responsible for causing the accident" (N.T. 10/1/01 at 18) and if defendant is found liable to the plaintiff "you must then find an amount of money damages that you believe will fairly and adequately compensate each plaintiff for all physical and financial injury he has sustained as a result of the accident." (*Id.* at 23.) The jury was then instructed as to the particulars of past pain and suffering, future pain and suffering, embarrassment and humiliation, disfigurement, enjoyment of life, and loss of consortium. (*Id.* at 23-25.)

While it is true that, based on the evidence presented, the jury was not required to award damages for future pain and suffering or embarrassment and humiliation, no other possible intervening cause was presented to this jury for the physical injuries alleged to have resulted from the crash; therefore, in blatant disregard of the law on which it was so instructed, it ignored uncontroverted evidence of broken bones and returned a verdict in the amount of zero damages.

The only plausible explanation, and one which I am compelled to adopt as my own, is that an air of passion, illogic, or capriciousness clouded the judgment of this

jury. Accordingly, plaintiffs George Tabchi, Resam Tabchi and Simon Tabchi are granted a new trial on the grounds that this jury, by wholly disregarding unassailable evidence of uncontested serious injuries sustained by plaintiffs Hiyam and Rehab Tabchi, demonstrated an unreasoned or "passionate" approach that cannot be gainsaid to have infected the entire outcome of this trial.

## V. CONCLUSION

In order to foster the climate necessary for jury deliberations, longstanding safeguards have been erected that place the reasoning processes undertaken by jurors off-limits from retrospective scrutiny. This is so even when the most atrocious allegations of what went on during that process have been made. The fact that prejudice cannot be proved in certain ways does not mean, however, that society must live with unjust results or that such prejudice must be institutionalized. Rather, to protect the sanctity of the deliberative process, we are properly limited in the evidence we can entertain and the standards under which we can impugn jury verdicts. When it is apparent by competent evidence, however, that a verdict is the product of passion, partiality, prejudice or corruption, or where it is against the clear weight of the evidence, a court is empowered and, indeed, is obligated to cast the verdict aside and grant a new trial.

In light of this, and for the reasons stated above, a new trial is granted to plaintiffs Hiyam, George, and Rehab Tabchi because the verdict was shocking to the conscience and against the clear weight of the evidence. Furthermore, in light of the illogic and passion evidenced by the jury in its failure to find compensable damages

with respect to the claims of plaintiffs Hiyam and Rehab Tabchi, passion is held to have permeated the entire verdict of the jury. Therefore, a new trial is granted to plaintiffs Resam, Simon, and George Tabchi on this separate ground.

## ORDER

And now, April 11, 2002, upon consideration of plaintiffs' motion for a new trial and judgment n.o.v., and brief in support thereof, filed on October 10, 2001, and defendant's brief in opposition thereto, filed on January 11, 2002, and after argument held on March 8, 2002, and for the reasons set forth in the accompanying opinion, it is ordered that plaintiffs' motion for judgment n.o.v. is denied;

It is further ordered that plaintiffs' motion for a new trial is granted, and a new trial shall be had on the issue of damages.