J-A19003-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| DALE SHELTON, | |
| Appellant | No. 412 WDA 2013 |

Appeal from the Judgment of Sentence Entered April 12, 2011
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s): CP-02-CR-0016217-2008

BEFORE:  BENDER, P.J.E., OLSON, J., and FITZGERALD, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                    **FILED AUGUST 1, 2014**

Appellant, Dale Shelton, appeals from the judgment of sentence of an aggregate term of 25-51 years' incarceration imposed following his conviction for third degree murder and related offenses.  Appellant claims the trial court abused its discretion by not removing a juror and by sentencing Appellant without considering his rehabilitative needs.  Appellant also contends that there was insufficient evidence supporting his conviction for third degree murder because the Commonwealth failed to disprove self-defense.  After careful review, we affirm.

Unfortunately, the trial court did not provide a summary of the facts adduced at Appellant's jury trial, despite having produced two Pa.R.A.P.

_____

[*] Former Justice specially assigned to the Superior Court.

1925(a) opinions in this case. However, Appellant's brief provides a objective summary of the facts, including citations to the pertinent portions of the trial transcripts, to which the Commonwealth has not raised any exception. Moreover, we have verified the accuracy of Appellant's factual summary. Thus, we adopt it as our own, with some slight modifications. The facts adduced at trial are as follows:

> On September 24, 2008, several people were shot. [N.T., 11/16/10 - 11/19/10, at] 64, 71. Sandra Stewart was shot with a .40-caliber bullet and died as a result of this incident. [*Id.* at] 235, 321, 347-48.

> Dorothy Johnson testified that she sat outside on Curtain Avenue with Sandra Stewart when shots erupted. [*Id.* at] 108-11, 115. They were on Curtain Avenue between the intersection of Warrington Avenue on one end and Climax Street on the other end. [*Id.* at] 73, 75, 91. Bey's Store was at the intersection of Warrington Avenue and Curtain Avenue. [*Id.* at] 79.

> According to Ms. Johnson, the shots came from Warrington Avenue. [*Id.* at] 112. Ms. Johnson had her back to Warrington Avenue so she could not see what precipitated the gunfire. [*Id.* at] 117. Then, she saw Devin Scott run by from the direction of Warrington Avenue and turn onto Climax Street. [*Id.* at] 112, 122-23, 125.

> Daria Baker testified that she stood outside when this incident occurred. [*Id.* at] 263. She saw a man walk by on the sidewalk and start shooting backwards, towards Warrington Avenue. [*Id.* at] 264, 269. He continued up Curtain Avenue. [*Id.* at] 269. Those were the first shots that she heard. [*Id.* at] 264-65, 268. Then, the man ran away. [*Id.* at] 266, 268.

> [Appellant] testified that prior to the incident on September 24, 2008, he and Devin Scott had an altercation. [*Id.* at] 376. Scott approached [Appellant] and hit him in the back of the head with something. [Appellant] turned and Scott aimed a gun at his face. [*Id.* at] 378. Scott threatened to kill him and demanded money. [*Id.* at] 379-80. Scott stole everything [Appellant] had on him, [as well as] his mother's car.

[*Id.* at] 379. [Appellant] did not contact the police because he feared that Scott would retaliate, killing him or his family. [*Id.* at] 382. After the robbery, [Appellant] obtained a .40-caliber firearm from Maurice Williams. [*Id.* at] 384.

Deenesha Ballard testified that [Appellant] had told her that Devin Scott robbed him, hit him with a gun, and stole his money and his mother's car. [*Id.* at] 281-82. [Appellant]'s mother, Pamela Harless, testified that she learned that Devin Scott robbed [Appellant] and stole her car. [*Id.* at] 356-58. [Appellant] was scared and did not want to contact police for fear of retaliation. [*Id.* at] 357-58, 359. [Appellant] also told Maurice Williams that Devin Scott had robbed him a couple of months before this incident. [*Id.* at] 207.

On the day of the shooting, [Appellant] was with Maurice and Kevin Williams. [*Id.* at] 387. They were going to find out about a situation involving fake drugs. [Appellant] and Maurice dropped off Kevin Williams. They drove on Curtain Avenue towards Warrington Avenue when [Appellant] saw Devin Scott. [*Id.* at] 388-89. This was the first time that [Appellant] had seen Scott since Scott robbed him and threatened his life with a gun.

[Appellant testified that] Scott looked directly at [him]. [*Id.* at] 89[-90]. They made eye contact and [Appellant] panicked. He was scared because he knew that Scott always carried a firearm, Scott had threated his life, and the car in which [Appellant] was riding was coming to a stop at a stop sign by Scott. [*Id.* at] 203-04, 390, 392. When the car stopped, [Appellant] [said he] got out, attempting to run away from Scott. [*Id.* at] 390. He saw Scott pull out a gun and fire it at him. [*Id.* at] 391. [Appellant] obtained his gun and fired in response. [*Id.* at] 391. After this incident, Deenesha Ballard and [Appellant] went on the run. [*Id.* at] 284-85.

Maurice Williams confirmed that he, Kevin Williams, and [Appellant] got into a silver vehicle and went to get a refund for fake drugs. [*Id.* at] 199-201, 228-29. They dropped off Kevin Williams and drove up Curtain Avenue towards Warrington Avenue. [*Id.* at] 202, 216, 229. They saw Devin Scott walking on the sidewalk and [Appellant] said, "There goes Little Dev, I'm out." [*Id.* at] 202. Devin Scott knew Maurice Williams' car and he knew that Maurice Williams was friends with [Appellant]. [*Id.* at] 218. When they drove past Scott, he would have been able

to see [Appellant] in the front seat of the car. [*Id.* at] 216, 218. [Appellant] got out of the car, a few seconds passed, and then Maurice Williams heard gunshots and saw gun smoke. [*Id.* at] 204. He saw [Appellant] shooting in his rearview mirrors, but [Appellant]'s back was turned towards Maurice Williams and he could not see a gun. [*Id.* at] 205. …

Jahane Harris testified that she was walking to Bey's Store when she passed a person on the sidewalk that walked on Curtain Avenue in the opposite direction. [*Id.* at] 149-50. A silver car passed her, which was going in the same direction that she walked. [*Id.* at] 150-51. The car stopped and a person exited the back seat. After a few seconds, he retrieved a gun. [*Id.* at] 151-52, 65. She ducked down by a fence. [*Id.* at] 151-52, 165. She heard gunshots, but she did not see the shooting begin. [*Id.* at] 152, 165. She looked behind her and saw a black car backing up with two people shooting out of the car. [*Id.* at] 155. She also saw Kevin Williams shooting. [*Id.* at] 156. …

Kevin Williams testified that he was outside on Curtain Avenue at the time of the incident. [*Id.* at] 226. He heard shots down around Bey's Store so he ran to get his illegal .45-caliber firearm. [*Id.* at] 230-31, 235, 236-37. He saw Scott running down Curtain Avenue shooting backwards towards Warrington Avenue. [*Id.* at] 230, 249. Kevin Williams started shooting towards Scott. [*Id.* at] 231, 248. Then, he hid the gun. [*Id.* at] 235. Unlike Ms. Harris, he did not see a black car driving away with people shooting out of the car. [*Id.* at] 236. …

Wanda Lewis heard gunfire and looked out of her window. She saw someone standing in the middle of Curtain Avenue, shooting towards Climax Street. [*Id.* at] 188-89, 194. After calling 911, she looked out of the window again and saw a man walking on the street and trying to put his gun away. [*Id.* at] 190. She could not see if someone was firing a weapon on the other end of the street. [*Id.* at] 194. …

Devin Scott, an associate of gang members, testified that he left Bey's Store and walked up the sidewalk towards Climax Street. [*Id.* at] 169, 335-36. He was on house arrest with a window of time to go to the hospital. Rather, he went to the store, carrying an illegal firearm. [*Id.* at] 178-79. He testified that he heard shots behind him from the Warrington Avenue

area, so he started running and shooting his nine-millimeter weapon over his shoulder. [*Id.* at] 169-70. He threw his nine-millimeter weapon in the bushes and his shirt in the garbage. [*Id.* at] 169, 174, 183. Law enforcement captured him and charged him with crimes related to this shooting. [*Id.* at] 175. He denied ever robbing [Appellant]. [*Id.* at] 178. Scott was the only person who could definitively testify that [Appellant] shot first. [*Id.* at] 169-70.

There were several people firing weapons during this incident. [*Id.* at] 103. There was evidence that showed that the bullets were being fired down Curtain Avenue, towards Bey's Store. [*Id.* at] 102-03. Fourteen .40-caliber casings were found on the sidewalk, in the parking lot, and on the street. [*Id.* at] 77, 98-99. The fourteen spent .40-caliber casings were discharged from the same gun. [*Id.* at] 311-12. Police recovered six nine-millimeter casings and two fragments. [*Id.* at] 83, 99. The nine-millimeter casings and fragments were all discharged from the same gun. [*Id.* at] 313, 315. A .45-caliber casing, one round, and two fragments were found. [*Id.* at] 86, 99. The police learned that Kevin Williams illegally had a .45-caliber weapon that he left on the ground after the gunfight. [*Id.* at] 94-99, 103-04. The .45-caliber casings were shot from the .45-caliber Smith and Wesson possessed by Kevin Williams. [*Id.* at] 317-18.

Appellant's Brief at 10-15.

The Commonwealth charged Appellant by criminal information with multiple offenses arising out of the events of September 24, 2008. Appellant's first trial resulted in a hung jury. At the conclusion of his second jury trial, however, Appellant was convicted of third degree murder, 18 Pa.C.S. § 2502(c), for the death of Sandra Stewart; criminal attempt – homicide, 18 Pa.C.S. § 901(a), for the attack on Devin Scott; aggravated assault (Scott), 18 Pa.C.S. § 2702(a)(1); firearms not to be carried without a license, 18 Pa.C.S. § 6106; and six counts of recklessly endangering another person, 18 Pa.C.S. § 2705.

- 5 -

On April 12, 2011, the trial court sentenced Appellant to an aggregate term of 25-51 years' incarceration. Appellant filed post-sentence motions which were denied by operation of law on September 26, 2011. He then filed a timely notice of appeal on October 24, 2011. His trial counsel, Owen Semen, Esq., filed a timely Rule 1925(b) concise statement of errors complained of on appeal, and the trial court issued its first Rule 1925(a) opinion on May 4, 2012. Subsequently, by order dated October 16, 2012, this Court dismissed Appellant's appeal due to Attorney Semen's failure to file a brief.

Attorney Seman filed a motion to withdraw his appearance on January 22, 2013. On January 23, 2013, the trial court granted the motion and appointed the Allegheny County Public Defender's Office to represent Appellant. Appellant, through current counsel, Assistant Public Defender Jessica Herndon, then filed a PCRA[1] petition seeking reinstatement of his direct appeal rights. The PCRA court granted his petition by order dated January 31, 2013, and he filed a *nunc pro tunc* notice of appeal on March 1, 2013. Appellant then filed a new, timely concise statement on June 5, 2013. The trial court issued its second Rule 1925(a) opinion on August 27, 2013, addressing the new concise statement. Appellant now presents the following questions for our review:

_____

[1] Post Conviction Relief Act, 42 Pa.C.S. § 9541 *et seq*.

1. Did the trial court abuse its discretion by refusing to dismiss a juror when, during the trial, an outside source contacted the juror and discussed the trial?

2. Was the evidence sufficient to convict [Appellant] of third degree murder, attempted homicide, aggravated assault, and reckless endangerment when he asserted a claim of self-defense and the Commonwealth failed to disprove beyond a reasonable doubt that he acted in self-defense?

3. Did the sentencing court abuse its sentencing discretion by imposing an excessive sentence on [Appellant] without considering all statutorily required factors, such as [Appellant]'s rehabilitative needs?

Appellant's Brief at 6.

Appellant's first claim concerns a jury issue that arose on the second day of his trial. He asserts that an extraneous influence was exerted on a juror and that a reasonable likelihood of prejudice resulted. The trial court summarized the situation that occurred as follows:

> The jury was sworn and testimony was received on November 17, 2010. The very next morning, in open court, without the jury present, the Court informed both counsel that its tipstaff relayed to it that a particular juror, #7, had an issue. The issue was Juror #7's daughter had received a phone call [the prior] evening and [that] the daughter then relayed the contents of that call to her mother, Juror #7. [N.T., 11/16/10 - 11/19/10, at] 128. After some discussion with counsel, the Court and counsel retired to chambers to await the arrival of Juror #7. Juror #7 told this audience of three that her daughter received a phone call last evening from a friend of the daughter. The caller told the daughter that your mother (Juror #7) knows one of the famil[ies] and the family knew her. [*Id.* at] 134, 135. Further questioning revealed that which family — the defendant's or the victim's — was not communicated in the phone call between the daughter and the caller. [*Id.* at] 135. Upon being asked if she knew the defendant's family or the victims' famil[ies], juror #7 responded negatively. There was no threat and juror #7 did not feel threatened or intimidated by the information her daughter relayed to her. [*Id.* at] 136. After

affirming her ability to be fair, juror #7 did state that "if I see someone and they know me, I'll have to tell you all...[."] [*Id.* at] 137. The juror then returned to the jury room to await the start of the proceeding. [*Id.* at] 137.

Counsel and the Court engaged in further discussion. After that discussion, the Court expressed its desire to keep her on the panel until "there's really [a] substantive issue[]" because at this point "she doesn't feel threatened." [*Id.* at] 139. The Court then made a credibility determination that was shared by defense counsel. "I believe from talking to her, ... she would be honest and tell us if she knows someone or if she feels threatened." [*Id.* at] 139.[1] Ultimately, the Court ruled, "I'm not going to release her unless there's something of substance that would require it." [*Id.* at] 140. The [Commonwealth] agreed. Defense counsel understood the reasoning.

_____

[1] Defense counsel's reaction to this observation by the Court was "I got the same feeling from her." [*Id.* at] 139.

Trial Court Opinion (TCO), 8/27/13, at 5-6.

Before we consider the merit of Appellant's claim that the contact made through Juror #7's daughter constituted an extraneous influence warranting removal of the juror, we must address whether the claim was preserved below. The trial court found that the claim was not preserved:

After consulting with [Appellant], defense counsel expressed the concern of his client. His solution to the issue was to get the daughter and interrogate her. [N.T., 11/16/10 - 11/19/10, at] 141. This Court rejected that proposal because that event would then "affect the mother" and, possibly exacerbate the situation to the point of it being deemed a threat to Juror #7. [*Id.* at] 142.

This entire issue consumed 15 full pages of transcript. [*Id.* at] 128-143. Not once did the word "Objection" or any variance of that word come from defense counsel's mouth.[2] He did not voice displeasure when the Court concluded Juror #7 would not be released. He did not voice a complaint when the Court

- 8 -

rejected his idea to subject the daughter to an inquisition. … Based upon the above analysis, the court finds the issue about Juror #7 to have been waived.

_____

[2] On two occasions, [Appellant] references that an objection was made. In his post[-]sentence motion he says an objection was made. [Post-sentence Motion], paragraph 7 (April 21, 2011). In his [first] Concise Statement he says "defense counsel objected[."] [*See*] paragraph 1(b), line 8. In neither instance does [Appellant] refer to the specific page of the transcript where the objection was made. The reason is simple. One cannot cite to something that was not done.

TCO, at 6-7.

Following the in-chambers interview of Juror #7, defense counsel informed Appellant that the trial court did not intend to take any further action with respect to the contact made with the juror. The district attorney, defense counsel, and the judge again returned to chambers, at which time the following discussion occurred:

MR. SEMAN: In the interest of making sure that my client is aware of everything that's going on in this trial, I've advised [Appellant] of what just happened, and I told him that we really don't know a lot about who it was that might have contacted this juror. And he has expressed to me some serious concerns, because what he has said is that it wasn't his family.

THE COURT: How does he know?

MR. SEMAN: He doesn't, but his concern is --

THE COURT: That's a knee-jerk reaction that anyone would have. But that's not affecting -- okay. I understand what he said, but I don't know what the significance of it is other than him just to say, "I'm not to blame." But that doesn't mean anything to me at this point because we don't know. He doesn't know.

MR. SEMAN: I think that's his problem, is that we don't know.

THE COURT: Okay. Well, **what do you do in light of not knowing**?

MR. SEMAN: **The only thing I think we could do is bring in the daughter**, and that's going to be a difficult task, I'm sure.

[A.D.A.]: Well --

THE COURT: See, when you do that, then you begin to affect the mother.

[A.D.A.]: Yeah.

THE COURT: Because at that point she's getting defensive and it becomes a threat to her.

MR. SEMAN: I think we also, though, have an issue with -- I think we should know who contacted a juror, because anyone involved in this case --

THE COURT: They didn't contact the juror.

MR. SEMAN: A family member of a juror.

THE COURT: What did they say?

MR. SEMAN: She doesn't know.

THE COURT: What she said was, "She says that your mother knows the family." I mean, but it wasn't threatening -- the impression I got was it was someone who -- a friend of the daughter said, "Your mother knows, you know, the family," but the mother doesn't even know which family, but all the families live in the same community. So we're talking about -- I don't see the damage at this point. I understand your client's posture. That's all I can tell you. I know what she said, but at this point that doesn't mean a lot to me.

N.T., 11/16/10 - 11/19/10, at 140-43 (emphasis added).

Clearly, defense counsel requested that the juror's daughter should have been brought in for questioning. However, we agree with the trial

court that at no point did defense counsel specifically request that the trial court remove the juror.

Nevertheless, Appellant argues that:

> [e]ven though defense counsel did not use certain words to make his objection, he objected by noting his client's concerns, why his client was uncomfortable with allowing Juror Number Seven to continue on the jury, and his suggestion that further investigation into this serious matter should occur. The words that he used sufficiently and adequately conveyed his objection to allowing this Juror to continue serving unless proper questioning was completed to ensure that she was impartial.

Appellant's Brief at 28.

We agree with Appellant that the lack of a specifically worded objection did not constitute waiver of his claim under these circumstances. Here, the trial court stated on the record that it was "not going to release [the juror] unless there's something of substance that would require it. Because, otherwise, I'm just setting this up where it becomes the defendant's determination as opposed to ours." N.T., 11/16/10 - 11/19/10, at 140. This statement indicates that the judge was, in fact, ruling on the question of whether to remove the juror, and strongly suggests that the decision was prompted by the concerns of defense counsel. In light of these particular circumstances, we conclude that Appellant's claim was preserved below.

Turning to the merits of Appellant's claim, we first note that "an abuse of discretion is more than a mere error of judgment; thus, a sentencing court will not have abused its discretion unless 'the record discloses that the

judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will.'" ***Commonwealth v. Walls***, 926 A.2d 957, 961 (Pa. 2007). We also consider of the following:

> An extraneous influence may compromise the impartiality and integrity of the jury, raising the specter of prejudice. ***See Carter by Carter v. U.S. Steel Corp.***, 529 Pa. 409, 604 A.2d 1010, 1015–16 (1992) (plurality). The relevant inquiry is whether the extraneous influence caused "a reasonable likelihood of prejudice." ***Id.*** at 1016; ***see also Commonwealth v. Bradley***, 501 Pa. 25, 459 A.2d 733, 739 (1983) (requiring showing that contact between member of the jury and court officer resulted in "a reasonable likelihood of prejudice" to defendant.). In making the "reasonable likelihood of prejudice" determination, the court must consider: "(1) whether the extraneous influence relates to a central issue in the case or merely involves a collateral issue; (2) whether the extraneous influence provided the jury with information they did not have before them at trial; and (3) whether the extraneous influence was emotional or inflammatory in nature." ***Carter***, 604 A.2d at 1017 (footnote omitted). The burden is on the party claiming prejudice. ***Id.***

***Commonwealth v. Sneed***, 45 A.3d 1096, 1115 (Pa. 2012).

Given the circumstances surrounding the contact made with Juror #7, we conclude that Appellant fails to meet his burden of demonstrating that "a reasonable likelihood of prejudice" occurred when Juror #7 was permitted to remain on the jury. Therefore, the trial court did not abuse its discretion in permitting the same. We reach this conclusion in consideration of the three ***Carter*** factors. First, the contact made with Juror #7's daughter did not involve a central issue in the case. The information conveyed to Juror #7 concerned only the observation that she knew one of the families involved in the case. The information did not remotely involve the circumstances of the

crimes for which Appellant was being tried and, therefore, it was a collateral matter.

The second *Carter* factor is largely inapplicable in this case. Juror #7 indicated to the trial court that she did not know any of the families of the parties, and she continued to assert the same after being questioned about the call from her daughter. Thus, Juror #7 cannot be said to have been provided with information apart from what she learned during the course of the trial without questioning her credibility. The trial court found credible her testimony that she did not know anyone involved in Appellant's case. Thus, the information received, even if 'new' in the most literal sense, was trivial in the circumstances of this case because it was Juror #7's impression that it was not accurate.

Assessing the third *Carter* factor, we conclude there is no evidence that the information conveyed was emotional or inflammatory in nature. Juror #7 did not indicate that the information conveyed, nor the manner in which it was conveyed, caused Juror #7 to be fearful in the least. Furthermore, she did not indicate that her daughter considered the information to be a veiled threat or otherwise cause her to be fearful. Moreover, Juror #7 expressed her willingness to inform the trial court if, during the course of the remaining proceedings, she recognized someone that she knew.

Appellant cites two cases in support of his claim that there was a reasonable likelihood of prejudice resulting from the contact made with Juror

#7, ***Commonwealth v. Sneed***, 45 A.3d 1096 (Pa. 2012), and ***Commonwealth v. Hetzel***, 822 A.2d 747 (Pa. Super. 2003). In ***Sneed***, the appellant claimed that his counsel was ineffective for not seeking the dismissal of a juror due to comments made to that juror by the victim's widow during a break in the trial. Our Supreme Court determined that the appellant could not demonstrate that a reasonable likelihood of prejudice had resulted from the court's failure to remove the juror. The juror "informed the court that the woman asked her about 'the wind and her hairdo' and how she styled her hair. [The juror] stated that she did not respond to the woman, did not know who she was, and did not inform anyone but the court." ***Sneed***, 45 A.3d at 1114. Given these circumstances, our Supreme Court held that:

> While the contact was improper, [the a]ppellant has failed to demonstrate that there was a reasonable likelihood that he suffered prejudice. [The widow's] remarks bore no relation to the case and were innocuous. Moreover, her comments were "ambiguous and not of such a nature that it can be said without hesitation that the speaker intended to influence a decision adverse to [the appellant]."

***Id.*** at 1115 (footnote omitted).

Appellant argues that the information conveyed in this case, in contrast to what had occurred in ***Sneed***, "could be construed as threatening or making an attempt to persuade Juror [#7]." Appellant's brief at 27. We disagree. There is nothing in the record suggesting that the information at issue was conveyed in a threatening manner, and it is purely speculative to suggest that a threat was implied. While not as innocuous as the comments

made in **Sneed**, the information conveyed to Juror #7 was, nonetheless, "not of such a nature that it can be said without hesitation that the speaker intended to influence a decision adverse to" Appellant. **Sneed**, 45 A.3d at 1115. Certainly this is true with regard to the information directly conveyed to the juror from her daughter.[2] Our Supreme Court's decision in **Sneed** does not support Appellant's claim.

In **Hetzel**, this Court considered whether the trial court erred when it removed a juror under the following circumstances:

> One evening after a day of hearing the Commonwealth's case, Juror #2 received a call from his sister. She informed him that her husband, Juror #2's brother-in-law, worked with [defendant]'s father. Juror #2 told his sister that he would not discuss the matter and the following morning he promptly told the judge about the telephone call.
>
> The trial judge, with counsel, interviewed Juror #2 and permitted counsel to question him as well. Although Juror #2 stated that he could be fair and decide the case based on the evidence, he also noted that his sister was upset when she called him and that he was "honestly ... a little bit" concerned about how [defendant] might react toward his brother-in-law if the jury found [defendant] guilty. Juror #2 tempered his concern with the statement that "it would not affect my judgment." Following the interview, the prosecutor made a motion to strike Juror #2 for cause. The trial court granted the motion.

**Hetzel**, 822 A.2d at 755-56.

_____

[2] We note that the phone call made to Juror #7's daughter was not an extraneous influence on Juror #7. The extraneous influence under consideration is the content of the call from the daughter to Juror #7.

- 15 -

In ruling that the trial court did not abuse its discretion in removing the juror, we stated:

> The trial judge believed that disqualification was appropriate based on the juror's answers to questions and his demeanor. The court noted the juror's concern over his brother-in-law's position and the fact that the juror interpreted his sister as "upset." Upon review of the transcript and in light of our standard of review, we find support for the trial court's concerns and so determine there was no abuse of discretion.

*Id.* at 756.

Here, there was no indication regarding which family member(s), if any, was supposedly known to Juror #7, nor what the nature of the relationship was between them. In *Hetzel*, by contrast, the relationship was known (the juror's brother in law worked with the defendant's father). Furthermore, Juror #7, unlike Juror #2 in *Hetzel*, did not express any trepidation whatsoever regarding her continued service as a juror. Therefore, *Hetzel* does not support Appellant's claim. Thus, we conclude that the trial court did not abuse its discretion in refusing to dismiss Juror #7.

Next, Appellant contends that the Commonwealth presented insufficient evidence to disprove his claim of self-defense. In reviewing this matter, we adhere to the following standards:

> A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Where the evidence offered to support the verdict is in contradiction to the physical facts, in contravention

to human experience and the laws of nature, then the evidence is insufficient as a matter of law. When reviewing a sufficiency claim[,] the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

***Commonwealth v. Widmer***, 744 A.2d 745, 751 (Pa. 2000) (internal citations omitted).

A claim of self-defense is governed by 18 Pa.C.S. § 505, which provides, in pertinent part, as follows:

**(a) Use of force justifiable for protection of the person.--** The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.

**(b) Limitations on justifying necessity for use of force.--**

…

(2) The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat; nor is it justifiable if:

(i) the actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or

(ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating, except the actor is not obliged to retreat from his dwelling or place of work, unless he was the initial aggressor or is assailed in his place of work by another person whose place of work the actor knows it to be.

18 Pa.C.S. § 505. Our Supreme Court has summarized self-defense law in Pennsylvania as follows:

- 17 -

> [A] claim of self-defense (or justification, to use the term employed in the Crimes Code) requires evidence establishing three elements: "(a) [that the defendant] reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm; (b) that the defendant was free from fault in provoking the difficulty which culminated in the slaying; and (c) that the [defendant] did not violate any duty to retreat." **Commonwealth v. Samuel**, 527 Pa. 298, 590 A.2d 1245, 1247–48 (1991). **See also Commonwealth v. Harris**, 550 Pa. 92, 703 A.2d 441, 449 (1997); 18 Pa.C.S. § 505. Although the defendant has no burden to prove self-defense, … before the defense is properly in issue, "there must be some evidence, from whatever source, to justify such a finding." Once the question is properly raised, "the burden is upon the Commonwealth to prove beyond a reasonable doubt that the defendant was not acting in self-defense." **Commonwealth v. Black**, 474 Pa. 47, 376 A.2d 627, 630 (1977). The Commonwealth sustains that burden of negation "if it proves any of the following: that the slayer was not free from fault in provoking or continuing the difficulty which resulted in the slaying; that the slayer did not reasonably believe that [he] was in imminent danger of death or great bodily harm, and that it was necessary to kill in order to save [him]self therefrom; or that the slayer violated a duty to retreat or avoid the danger." **Commonwealth v. Burns**, 490 Pa. 352, 416 A.2d 506, 507 (1980).

**Commonwealth v. Mouzon**, 53 A.3d 738, 740-41 (Pa. 2012) (footnote omitted).

Instantly, there is no dispute that Appellant properly raised the matter of self-defense in the trial court. TCO, at 4. Consequently, the Commonwealth bore the "burden of negation" in this case. **Mouzon**, **supra**. The Commonwealth's approach to sustaining that burden was straightforward; the Commonwealth argued that Appellant was the initial aggressor. The trial court found that the Commonwealth had sustained their burden with sufficient evidence:

In simplistic form, [Appellant] claimed Devin Scott recognized him from Scott's vantage point on the sidewalk and, he, [Appellant], needed to escape. Another competing inference, and one the jury was ultimately persuaded by, was [Appellant] saw Scott without Scott being aware and [Appellant], juiced with thoughts of retribution, saw this as the perfect opportunity. The physical evidence contributes to the Commonwealth's position also. The casings left by [Appellant's] gun contradict his version. A cluster of casings is just not consistent with running fueled by fear. Unlike the trail of casings from Devin Scott's gun which inferentially supports the idea that Devin Scott was running from [Appellant]. Eyewitnesses also poked fatal holes in [Appellant's] theory. A young girl said she saw someone get out of the car and point "[a gun] the same way I was walking," [N.T., 11/16/10 - 11/19/10, at] 151, and in the direction of Devin Scott. She crouched down on her knees, then heard gunfire. [*Id.* at] 151, 152. Maurice Williams, the driver of the car, confirmed as much. [Appellant] got out, paused, and then "started shooting." [*Id.* at] 189. [Appellant's] posture was both hands on his gun, arms extended, chest high. [*Id.* at] 189. This positioning was confirmed by the closest person to [Appellant] – Maurice Williams. [*Id.* at] 205. Inferentially, the [Commonwealth's] witnesses established that [Appellant] fired first. [Appellant] said otherwise with an assist from Daria Baker, who was babysitting that day. Ms. Baker was on the front porch and said the first shots she heard were from a guy walking on the sidewalk "shooting backwards." [*Id.* at] 244, 268. This aspect of the case — who shot first vis-à-vis, who was the initial aggressor — bottomed out on a credibility determination. The jury made the call and believed the totality of the [Commonwealth's] evidence. That determination is supported by a sufficient quantity and quality of evidence.

TCO, at 4-5.

We agree with the trial court that the Commonwealth presented sufficient evidence to satisfy its burden of negation. Accepting Appellant's argument that he reasonably feared for his life due to his prior encounter with Devin Scott would require us to afford his testimony greater weight than the testimony of the Commonwealth's witnesses and the physical

evidence that contradicted his justification defense. However, "[w]hen reviewing a sufficiency claim[,] the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence." *Widmer*, 744 A.2d at 751. Appellant's sufficiency claim is a thinly veiled attack on the weight of the evidence, as the jury's verdict was dependent upon their assessment of Appellant's testimony supporting his claim of self-defense, weighed against the Commonwealth's evidence refuting that claim. It is clear, however, that the Commonwealth's evidence was sufficient to allow the jury to believe the Commonwealth's theory and reject Appellant's contention that his actions were justified by his fear. Accordingly, we conclude that Appellant's sufficiency claim lacks merit.

Finally, Appellant contends that the trial court abused its discretion in sentencing him to a term of 25-51 years' incarceration. Appellant argues that his sentence is excessive and that its imposition contravened fundamental norms of sentencing because the trial court failed to consider his rehabilitative needs as required by section 9721(b) of the Sentencing Code.

> Our standard of review in sentencing matters is as follows:
>
> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law,

exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.

*Commonwealth v. Hoch*, 936 A.2d 515, 517–18 (Pa. Super. 2007) (citation omitted).

However, the right to pursue a challenge to the discretionary aspects of a sentence "is not absolute." *Commonwealth v. McAfee*, 849 A.2d 270, 274 (Pa. Super. 2004).

> Two requirements must be met before we will review this challenge on its merits. First, … [A]ppellant must set forth in his brief a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of a sentence. Second, … [A]ppellant must show that there is a substantial question that the sentence imposed is not appropriate under the Sentencing Code. The determination of whether a particular issue raises a substantial question is to be evaluated on a case-by-case basis. In order to establish a substantial question, … [A]ppellant must show actions by the trial court inconsistent with the Sentencing Code or contrary to the fundamental norms underlying the sentencing process.

*Id.* (internal citations omitted).

Appellant has complied with the first requirement by providing in his brief a concise statement of matters relied upon for allowance of appeal pursuant to Pa.R.A.P. 2119(f). Appellant's Brief at 41-43. Appellant also meets the second requirement as his sentencing claim presents a substantial question for our review. *See Commonwealth v. Riggs*, 63 A.3d 780, 786 (Pa. Super. 2012) (holding a substantial question was presented when appellant argued in his Pa.R.A.P. 2119(f) statement "that the trial court failed to consider relevant sentencing criteria, including the protection of the public, the gravity of the underlying offense and the rehabilitative needs" of

the appellant). Accordingly, we will address the merits of Appellant's sentencing claim.

Appellant contends that due to his young age (18) at the time he committed the acts underlying his conviction, "he has the potential for rehabilitation, and he is amenable to treatment and supervision." Appellant's Brief at 46. Appellant argues that he

> is an intelligent young man who could make something of his life. Prior to this incident, [Appellant] had enrolled himself in college and had been trying to better his life. However, he has little or no chance to make a positive impact on the community with a sentence of this length. [He] plans to use the time incarcerated to better his life by involving himself in educational and religious pursuits, with the goal of one day making a positive impact on the community. He would hope to be released from incarceration with time to bring change to the community. With the length of his current sentence, he could remain incarcerated until he is over seventy years old, which provides him no chance at becoming a productive member of society.
>
> Additionally, [Appellant] expressed significant remorse for his actions during this incident and he sincerely apologized to the family. He acknowledged his poor choices and he accepted responsibility for his actions. [Appellant] requested the opportunity to make a positive impact in order to honor the victim and her family since he is truly remorseful for causing this tragic situation.
>
> The sentencing court did not adequately consider these factors individual to [Appellant] and how this harsh sentence addressed his rehabilitative needs and potential return to the community. By failing to adequately consider all required sentencing factors, such as [his] rehabilitative needs, the sentencing court abused its discretion by crafting an unreasonable sentence.

*Id.* at 46-47.

The trial court notes that it imposed standard range sentences at every count for which Appellant was convicted. The court also disagrees that it failed to consider Appellant's age as it relates to his rehabilitative needs in crafting the aggregate sentence. Despite Appellant's young age, the trial court found it had to consider Appellant's already substantial involvement in the criminal justice system:

> As identified in the Pre-Sentence Report, he was adjudicated delinquent of delivering crack cocaine to another person in August, 2005. At the time, he was 15 years old. A few weeks before his 17th birthday, he was adjudicated delinquent of carrying a firearm and possessing drugs with intent to deliver them to another person. A mere 16 months later [Appellant] committed this crime.

TCO, at 8.

The trial court also states that its justification for imposing the sentence

> was a combination of factors and [was] adequately set forth at the sentencing hearing. The murder affected numerous people. Many of those individuals gave moving and inspirational speeches. … His rather short but intense criminal history was the groundwork for the public to be protected from [him]. He had two previous efforts at modifying his behavior consistent with society's expectations. Both failed. … Despite a plea that he was a self[-]starter and obtained his GED which led to his enrollment at a local community college, the government's argument carried the day. He attended one semester. He failed every class that he took. These facts allowed the court not to be influenced at all about the rehabilitative needs of [Appellant]. In sum, the sentence was just and reasonable.

*Id.* at 8-9.

We agree with the trial court and discern no abuse of discretion. It is clear that the trial court considered Appellant's rehabilitative potential but ultimately found it wanting due to Appellant's failure to modify his behavior following two prior interactions with the justice system. Instead, the trial court gave greater weight to other section 9721(b) factors such as the protection of the public and the impact of the crime on the victim and the community. We will not disturb the trial court's weighing of these factors. *See Commonwealth v. Marts*, 889 A.2d 608, 615 (Pa. Super. 2005) (holding that "the fact that Appellant disagrees with the sentencing court's conclusion regarding his rehabilitative potential does not render the sentence imposed an abuse of discretion"). Moreover, "when reviewing sentencing matters, we must accord the sentencing court great weight as it is in the best position to view the defendant's character, displays of remorse, defiance or indifference, and the overall effect and nature of the crime." *Commonwealth v. Brown*, 741 A.2d 726, 735 (Pa. Super. 1999). Accordingly, we conclude that Appellant's sentencing claim does not entitle him to relief.

Judgment of sentence *affirmed*.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>8/1/2014</u>